Timothy Russell for Appellant U.S. Horticultural Supply. If I could, I'd reserve three minutes for rebuttal. That request will be granted. My client's been referred to by several names in the case, including Geiger, E.C. Geiger, USHS, for purposes of simplicity. Hopefully. Thank you. I'll refer to it simply as USH. I'd like to focus first on the question of whether there was sufficient evidence to withstand summary judgment on the conspiracy issue. As the district judge found, there was not. There's extensive treatment of that issue in our briefs, and what I would like to focus on is the question of the so-called plausibility requirement under Matsushita. Before you get there, could you explain to me where in the record you established what the relevant market was? And first, I assume you agree that that's one of the essential elements under Ligon that you have to prove. It is. We do have to prove anti-competitive effects, and therefore we have to prove either market power or actual anti-competitive effects. I would submit that we did prove actual anti-competitive effects insofar as we showed, or there was evidence anyway, that there was a price increase in the mid-Atlantic region. Well, what was the relevant product market? The relevant product market. And where in the record is that established? Your Honor, I think the relevant product market is controlled release fertilizer, or CRF, at the retail level. That's the relevant product market, and it's the only relevant product market we contended was one in which Scotts had market power. The evidence, and I can't, as I stand here, cite you to chapter and verse or page in the appendix, but I think they are included in our briefs. The evidence included a number of things that established that CRF was indeed a product with which no other products were interchangeable and for which, as a practical matter in the professional horticultural business, there were no substitutes. There was so-called practical indicia evidence, evidence of industry perception, evidence of distinct or different prices from other products that might have been alleged to be competitive with or interchangeable with CRF. The only other one anyone ever made any reference to at all being water-soluble fertilizer. They had distinctly different, radically different prices. And, in fact, Scotts has never made any contention in this case that water-soluble fertilizer or anything else was reasonably interchangeable with controlled release fertilizer. The industry perception evidence consists of, is contained in a number of things, including Scotts' own documents, which over and over and over again refer to CRF as a distinct product line, not interchangeable with anything else. The so-called L-strut declaration of a gentleman who worked with Scotts and with USH for years said these products are not interchangeable in use. The unique characteristics of CRF contributed to establishing or showing that it was not interchangeable with any other product. And a host of other evidence. What the district court said was, well, there is this practical indicia evidence, but I'll brush that to one side. I'm not even sure she said that. I'm not even sure she paid much attention to it at all. There are no numbers. You haven't shown me an econometric study or econometric survey that shows cross-price elasticity of demand. And in the absence of that, you can't show or haven't shown non-interchangeability, non-substitutability, and therefore you haven't shown a relevant product market. We think that's- Do the practical indicia on their own establish these markets, or do you have to have the traditional measures of interchangeability and cross-elasticity? Well, interchangeability, Your Honor, is a non-interchangeability, or interchangeability, substitutability is a conclusion. That's the fact ultimately we must show. I think the cases make clear, Feynman, Brown-Shue, Feynman in this court, Brown-Shue, of course, and other cases that one measure of non-interchangeability may, of course, be a showing of cross-price elasticity or non-elasticity. I'm never quite sure whether you have to show positive or negative elasticity, but that the product reacts or doesn't react to changes in price. That is merely one measure. There are cases which suggest, and I think Brown-Shue again is one of them, that even with a showing of cross-price elasticity, you may have to show practical indicia, and there are cases, Tunis in this court being one, that indicates that non-interchangeability- That's what I was getting at. In other words, don't you really have to look at all of it? The practical indicia by itself isn't really enough. Well, I think practical indicia is enough. What you don't have- There's no case that suggests that cross-price elasticity established by an econometric study is a necessary element of showing non-interchangeability, of showing a relevant product. Practical indicia are indeed enough. I think the Tunis case, where we're talking about tractors for use in the mushroom industry, if my recollection is correct, there was no suggestion in the opinions of this court in that case of a requirement that the plaintiff adduce evidence of cross-price elasticity. You seem to rely heavily on Brown-Shu. Am I correct that you didn't cite it to the district court? I think that is correct, Your Honor. What we did cite was- How could it be so important here and not cited below? Well, it's- We normally don't look at important issues or important cases on appeal that were never presented to the district court. We may not have cited the case, and if we didn't, perhaps, were to be faulted as brief writers for that. What we did cite were the principles of Brown-Shu and a host of cases in this court and others that did cite Brown-Shu for the very principles that we relied on. That is the adequacy of practical indicia of non-interchangeability. So I think the waiver argument that Scott says- So you put the issue before the district court, albeit in a less-than-ideal fashion. I think the record is perfectly clear that we did raise that issue and made that argument in the district court based on Feynman, based on Tunis, based on other cases from this court and other courts. We did not cite Brown-Shu. Those cases cited Brown-Shu. It's not as if the district court was ignorant or should have been ignorant of Brown-Shu as some decision lurking in the bushes somewhere. The Third Circuit, this court's cases, of course, did rely on it. Over a period of four years after you alleged that there was this concerted action to drive your client out of the market, Scott's treated your client pretty well, didn't he? Well, it did and it didn't. There is evidence in the record that over that period of four years it favored Griffin in various ways. For example, the most glaring of which was that it did permit Griffin, which had a stranglehold, a near-exclusive position in New England to begin with, to come into the Mid-Atlantic where USH had been near-exclusive. On the other hand, it did not permit USH to go into New England and sell during that very same time. There is some evidence in the record that various price concessions or discounts, promotional deals, if you will, were given to Griffin but not to us. It treated us well in certain other respects during that period of time. It enlarged our credit line, for example, from $1.something million to $3 million. And that is... That's where your client or some person in your client said they pulled a fast one on the company. There was an email which perhaps unfortunately did suggest that he pulled a fast one on the company to induce Scott's to increase our credit line. That's not a favor to my client for which Scott's got nothing in return. My client was the fourth largest distributor of Scott's nationwide on a nationwide basis. Not that we distributed nationwide, but if you take all the distributors nationally, we were the fourth largest distributor until the field was prepared. And there is a document that the district judge referred to in the record which refers to the necessity to prepare the field for my client's disappearance until it was prepared. It was altogether in Scott's interest to keep my client selling Scott's product, which it did. Time ensued after that document, which Scott's did various things to help your client. Well, the credit line wasn't increased until late 2001, Your Honor. That's part of the flaw in the district judge's reliance on the so-called four-year gap. You've got to have concerted action here, too. You've got to have concerted action, and we think the circumstantial evidence was ample that there was concerted action. Did it tend to exclude independent action? It did, and I think if there's a legal issue in this case, I think it's that. I think the district judge's approach to the conspiracy issue can be capsulized as follows. She found our theory on an economic basis to be implausible. She then took that as a license to say, well, if it's implausible, I must find unambiguous circumstantial evidence, and if the evidence could equally support or could support inferences either way, the plaintiff loses, and summary judgment is appropriate. We think our theory was eminently plausible. That's discussed extensively in our briefs. Why, as an economic matter, our theory was eminently plausible. Given that, I think the cases are clear. Notably, this court's decision in Petruzzi makes it eminently clear that even if the circumstantial evidence could support an inference of non-conspiratorial conduct, no concerted action, if it also could rationally support an inference of concerted action, it is adequate to prevent or stall the entry of somebody. It doesn't have to tend to exclude? Your Honor, our position is that the phrase tends to exclude, it says, means precisely that. If it tends to, the phrase tends to exclude does not mean the evidence must unambiguously, unequivocally support only the defendant. If that were the case, circumstantial evidence could never, would never forestall or prevent the entry of summary judgment in favor of a plaintiff unless the evidence unequivocally favored the plaintiff. That can't be the law. What this court said in Petruzzi's, this court said in Tunis, is that Matsushita and Monsanto cannot be read to mean that if the evidence is plausibly consistent, both with concerted action and with non-conspiratorial independent action, summary judgment is warranted. So whatever I take tend to exclude to mean, therefore, merely that the evidence rationally tends to support an evidence of conspiracy, not that it also, that it's unambiguous, that it does not support and is not consistent with an inference of unilateral conduct. It can't mean that, or what Matsushita then means, if it does mean that, is that only when evidence unambiguously supports a plaintiff, i.e., when a plaintiff is entitled to summary judgment, a defendant is not entitled to summary judgment. Because in looking at the evidence that you cited, you know, that dinosaur memo, I'll recall it and the rest of that, some of it's, I don't want to call it nasty stuff, but some of it's, you know, admittedly you've got some interesting material there, but you could certainly read that both ways. You could just read it that I'm, you know, Scots and I'm doing this for my own good. It doesn't necessarily mean that I'm in cahoots with somebody else, if you follow me. Your Honor is correct. It does not necessarily mean that. I would argue, although I won't argue, I would argue in another circumstance, that I don't think a reasonable juror could take that or could view all that evidence and conclude this was unilateral. But I'll concede for purposes of this argument today that a reasonable juror could do that. I won't belabor you with a precise statement from Petruzzi's, but I refer you, I can say it by memory, it's 998 F. 2nd, 1231. This court stated, look, you can't read Massachitta to mean where the evidence is plausibly consistent with both sides of a Section 1 conspiracy case. The plaintiff loses. He loses summary. It can't mean that. The court in that case relied on the petroleum products antitrust litigation from the Ninth Circuit, where that court went to some greater length to say, if we did that, it not only doesn't mean that because Massachitta simply, Massachitta then falls of its own weight because what it then has to be construed as saying is the plaintiff only wins if the plaintiff, the plaintiff only avoids summary judgment if the plaintiff's entitled to summary judgment. I agree with you. I think that's the guts of the case right there. It's been a long time since I took antitrust, and I'm not going to tell you what the grade is that I got in it. I won't tell you mine either. Okay, Mr. Russell. Thank you. We'll have you back on rebuttal. Thank you, sir. Mr. Taylor. Yes, Your Honor. May I please the court? My name is Wendell Taylor on behalf of the Scotts Company in this matter against E.C. Geiger, and if the court will allow, I will refer to Geiger as Geiger. This court should affirm the district court's summary judgment ruling on all grounds. The court issued an extensive 60-page opinion. We had extensive oral argument on summary judgment. There was extensive briefing before the judge on summary judgment, and the court found that Geiger had failed to put forth a prima facie case of conspiracy for at least four different reasons. The court found that Geiger had failed to show any direct or circumstantial evidence that tended to exclude unilateral conduct. The court also found that Geiger had failed to prove valid markets in the unreasonable restraint of trade element. Would you be willing to comment right at the onset about what he just said? Now, we all know there are a number of documents that were produced here. There were statements by people in your client's organization, which I think counsel just conceded you could read both ways. It could mean you're in cahoots with somebody. It could mean you're just interested in improving your own situation. Are you with me so far? Yes, Your Honor. He says, you know, that statement that it must tend to exclude independent action doesn't mean that. What do you say to that? Well, Your Honor, looking at the case of Petruzzi's I think is a prime example of a case where it specifically shows that you must look to evidence that tends to exclude. In the facts of Petruzzi's, the court did find that there was a plausible theory of conspiracy that had predatory pricing elements to it like in Matsushita and found that there was reasonable evidence that was presented that showed that the parties may have conspired. And so that part of the test was satisfied in Petruzzi's, but the court found as to one of the defendants that there was no evidence, the standard I think was the name of the defendant, there was no evidence even on a plausible theory that tended to exclude that that defendant acted unilaterally. And this court found even after it got past the Matsushita plausibility standard that even if Geiger had put forth a plausible theory that as the evidence was presented, the court could not find that Geiger had tended to exclude that Scott acted on its own. There was a body of evidence that was presented. The particular piece of evidence you discuss, Judge, is the dinosaur memo. The four corners of that document, no fewer than two times, Scott says that it can do nothing about Geiger's pricing. It says that explicitly to Griffin in the four corners of the document, and that is in fact the case. And at the end, Scott says that pricing decisions by distributors in the manner of Geiger tend to have them go the way of the dinosaur. Now the court looked at very specific evidence that was presented primarily regarding Geiger South, which was a company that Geiger created in Florida. Scott's was its first supplier for products for Geiger South, and Scott's gave Geiger a line of credit. That went the way of the dinosaur? Yes, Your Honor. That company had a sales and marketing strategy to price products at low prices in order to gain market share quickly. And the specific testimony from Geiger's own witnesses was that that was a flawed strategy, and it led to Geiger South's demise. Scott's knew keenly that this led to the demise of Geiger South, because Geiger South owed Scott's money, several hundred thousand dollars at the time, and that was the basis of the 1996 distribution agreement. At that point, Scott's had very good knowledge of Geiger's pricing decisions. The court discussed earlier Geiger's credit line, whereas the last time that Geiger showed Scott's financials, its credit line was lowered, and then Geiger refused to show Scott's financials. So on the heels of Geiger South, on the heels of Geiger refusing to show financials, and on the heels of market intelligence, that a court in this circuit has found it's very logical for suppliers to get information from its distributors about pricing decisions of other distributors. The court found for those and other reasons that Scott's only acted in its own best interest. Now, turning back to the Matsushita plausibility test, there the test is if the plaintiff does not have direct evidence, then it must prove its case with circumstantial evidence. When it's using purely circumstantial evidence, the rule is that the court looks to plausibility. Now, the reason for this, and courts have held that mistaken inferences on circumstantial evidence are particularly harmful in cases that could have, that where the defendant's actions could be pro-competitive or could be anti-competitive. Courts don't want to make mistaken inferences on circumstantial evidence that could thwart pro-competitive behavior. This is the very situation here as the court talked earlier about the case of Legion. There are pro-competitive justifications for suppliers favoring one distributor over another. This is an element that Judge McLaughlin below never got to determine, even if Geiger's case had been proven, whether it was unlawful that Geiger was treated unfairly. And in Legion, the court instructed that suppliers have a unilateral best interest to have viable distributors. And viable distributors do things like have customer service and are able to compete in the inter-brand market and that certain aspects of a company's business that may hinder intra-brand competition is lawful. And so here, it would be very costly to have mistaken inferences. So the test on plausibility is if the plaintiff puts forth an implausible theory, then fewer inferences are warranted on the circumstantial evidence. What does tend to exclude mean? I feel like we're back in the first case where we're talking about two equal inferences. But what does that mean at this stage of the proceedings that the district court took its action? At this stage, Your Honor, tend to exclude is when you look at Scott's actions, did Geiger show the court that Scott's actions were not unilateral, that it tended to exclude that Scott's actions were in its independent best interest? The court looked at the record and found that Scott's actions as a body, it had ‑‑ You have to eliminate all other possible inferences? Does it just have to sort of lean that way? Well, you don't have to eliminate all other inferences. And it is our position that the two tests are separate. And the case, again, of Petruzzi's is a prime example where the court found a plausible theory and circumstantial evidence but still found that one of the defendants was dismissed from the case because there was nothing that tended to exclude that that party had acted on its own. Now, when looking at implausibility, Geiger would have this court look only to what it calls economic rationale of the alleged conspiracy. This is not what the court in Matsushita looked at. And the rule from Matsushita, and it's often quoted as a second phrase, second part of this phrase, but from Matsushita it clearly says, it follows from subtle principles that if the factual context renders the claim implausible, if the claim is one that simply makes no economic sense, respondents must come forward with more persuasive evidence to support their claims. In this case, the court below cited this rule, looked at the economic interest and the theory from economic basis, but also looked at it on a factual basis. Now, and that's exactly what the court in Matsushita applied. The court there looked at a predatory pricing conspiracy that was at a 20-year duration. And the court found that not only was it economically implausible that a predatory pricing conspiracy existed, the court also determined that the duration of the conspiracy, that it was implausible that that conspiracy lasted for 20 years. So it was a factual analysis as well as an economic analysis on plausibility. And, again, the case of Petruzzi's also found this way in that the court looked at a similar scheme that had a predatory pricing element. The claim there was that the defendants had entered into a market. Do you feel you have to look at interchangeability and cross-elasticity and all of that, or that it's just enough to look at the practical indicia? By that I mean, you know, the public recognition, the product characteristics. The practical indicia only is used to support whether or not the products in the alleged product group are reasonably interchangeable. So we argue that it is one test. And the court must determine first under Queen City Pizza and others, cases from the circuit, that it is that products in a product group are only those that are reasonably interchangeable with each other and that have a cross-elasticity of demand. In Geiger's alleged product market in this case, they've stated it differently several times. Today they said, I asked the question, I think, what is the relevant market? And they said controlled-release fertilizer at the retail level. What's your view on that? Well, firstly, Scotts does not compete at the retail level. Scotts is a manufacturer of horticultural products. It sells its products to distributors. And so any product market that, from Scotts' point of view, is a controlled-release fertilizer that are sold to retailers is an insufficient market. So why should we even get into plausibility analysis? If they've identified the wrong relevant market or they haven't shown any relevant market, that's game, set, and match, isn't it? Yes, Your Honor. There are several bases that this court could affirm the district court below, either finding that under plausibility and no circumstantial evidence or in an attempt to exclude from or either under product market or geographic market. Particularly with respect to the product market, the product market itself of controlled-release fertilizer, Geiger never listed the specific products that were in this category. Geiger's counsel discusses only other products that are not interchangeable with controlled-release fertilizer, but they never do an analysis of the fact of whether the products within their alleged controlled-release fertilizer product market are interchangeable with each other. And that's not merely a technical defect by Geiger, because below, when Scotts argued below, and Geiger said Scotts' actions were to harm it, that we put forth two contracts, the Grow Code and FACOD agreement, which survived the distribution agreement, both in the controlled-release fertilizer product market. And we argued that it was implausible that Scotts would enter into a conspiracy to harm Geiger in the controlled-release fertilizer market, and at the same time in 2002, enter into two additional contracts in the controlled-release fertilizer product market. Geiger responded. The Grow Code went all the way to 06, is that right? Yes, Your Honor. September of 06? Yes, Your Honor, and the Grow Code agreement being a private label product that Geiger had the exclusive right to market. Now, Geiger then argued that those two products were not, and I quote, adequate substitutes of other Scotts' brands of controlled-release fertilizer. Now, that is language straight out of the case law, that you can't have a product market that includes products that are both adequate substitutes and those that are not adequate substitutes. But Geiger does sufficient harm to its own product market by trying to exclude from its product market Grow Code and FICOD, as well as the product of Neutral Code. Geiger again alleges, and this is back to the plausibility, but these issues work together, that the conspiracy was that Griffin would be the sole distributor of Scotts' products and it was to harm inter-brand competition of controlled-release fertilizers. There is undisputed evidence in the record that Griffin itself sold the product Neutral Code, and this was a controlled-release fertilizer product group. Now, when Scotts put forth evidence that Griffin sold Neutral Code throughout the entire time period covered by Geiger's complaint and into the future from that point and continued throughout to this day, and Judge McLaughlin found at least until 2007 Griffin still sold this Neutral Code product, Geiger again alleges that Neutral Code is not an adequate substitute for certain versions of Scotts' products. So Geiger's product group is wholly insufficient if it includes both products that are reasonably interchangeable and not reasonably interchangeable. And the court below Geiger contends that the court did not look at the entire body of evidence. The court looked at the practical evidence as well as the evidence presented by Geiger's experts. Geiger's experts cite the proper test but then fail to apply it. And the court looked at each and every piece of the evidence and determined that on a whole that Geiger had failed to put forth a valid product market. Now, Scotts itself filed Dahlberg motions to exclude the experts as well as motions in Lemony to exclude the market evidence that was put forth by Dr. Elstrock and others. And the court denied those motions as moot, not falling into the trap of flat glass, and looked at the entire body of evidence that was presented and determined that Geiger had failed to put forth a prima facie case. Now, as the court noted, there were three. We've discussed implausibility and tends to exclude and also the product market. If the court finds that Geiger has failed to put forth sufficient evidence of a geographic market, then this judgment should also be affirmed. I was going to ask you about that. Why should they lose on geographic market? Your Honor, for the same reasons that Geiger loses on product market. Geiger there failed to undertake the proper test. The test there is an application of buyer preferences. You look for a specific geographic market to where buyers buy. And the evidence they marshaled, as I recall, focused on Scotts' internal documents, not what the buyers wanted. Do I understand your position on that? Yes, Your Honor. That is a piece of it. They look at Geiger's internal marketing documents, which do not intend to sufficiently allege antitrust product or geographic markets. They also rely on the 1996 distribution agreement between Scotts and Geiger that Geiger states the four corners of the mid-Atlantic market. This document itself contains states in which Geiger claims it had the right to distribute Scotts' products. First, that market is deficient in that Scotts did not mandate where Geiger could sell products in that contract, only where Scotts would deliver products to Geiger's customers. Geiger had the right to sell Scotts' products throughout the country, and it did. Moreover, that contract itself contains states that were not, even Geiger can allege, were in the mid-Atlantic, including Texas and Louisiana. Okay. If the Court has no further questions. Mr. Taylor, thank you very much. Thank you. Mr. Russell, we'll have you back on rebuttal. A few points for the Court. We never asserted that GroCoat, the private label branded CRF, was not interchangeable in use with CRF generally. I think Mr. Taylor has slightly misstated what we did argue, and I think the District Court misperceived what we argued, was that if a dealer such as USH did not have a full line of CRF products, Scotts' CRF products, GroCoat and then the Osmocote brands, GroCoat being private label, Osmocote being the flagship brand, it couldn't survive. I don't think we ever argued that the product in a GroCoat bag was not CRF interchangeable with the CRF in an Osmocote bag. With respect to geographic markets, Texas and Louisiana are irrelevant. We never sold in Texas or Louisiana. There was a reference in the distributor contract to the fact that if we chose at some point in the future to sell in those markets, Scotts would supply us, but we never exercised that option. What's your response to opposing counsel's argument that you didn't define the relevant market because you guys are distributors and you're trying to define it by the retail level? The market, Your Honor, in which we maintain that the anti-competitive effects were felt, and that obviously is the touchstone of the rule of reason case. You have to show anti-competitive effects in a market, is the market for retail sales of CRF. Scotts was not a participant directly in that market, but the allegation is, the case is Scotts conspired with a participant in that market, a retailer, to, among other things, raise retail prices. That's the Monsanto case. Monsanto was not a participant in the retail market for pesticides. Spray-Rite and others, the Terminator distributor and the other distributors, were. That's a perfectly adequate vertical. It's the nature of a vertical conspiracy. The anti-competitive effects here, the increase in prices for CRF, are most often felt, and we stood ready to prove that they occurred in the retail market itself. It's absolutely immaterial that Scotts was not a retailer. Many manufacturers aren't retailers. They're found liable all the time for vertical conspiracies under Section 1 of the Sherman Act. So that, I think, is a red herring. With respect to Judge Van Antwerpen's inquiries about what tends to exclude means, and I'll lump with that the other phrase, as consistent with, my short answer to that is what they mean is what the Supreme Court and Eastman Kodak clarifying Matsushita said they mean, and that is what it said. In effect, all we meant in Matsushita was the inferences from circumstantial evidence must be reasonable in order to support a claim of conspiracy under Section 1. In other words, they must be, the word tends, to take the word tends as the example, take the same word from Rule 401 of the Federal Rules of Evidence. I think it's 401. Does the evidence tend to make a fact material to the action more or less likely than it would be without the evidence? I sat through the first argument today, and it seemed to me that there was a similarity between what was being argued there and here. The government saying, look, evidence can tend to show non-guilt or guilt. If the jury finds guilt on the basis of it, that's perfectly okay. This happened at a very different stage. I understand that it did, and it's a very, very rough analogy, but it seems to me similar to what, in terms of elucidating what the word tends means in the context of Matsushita, it simply means is there plausibility to the plaintiff's theory? If so, the circumstantial evidence only, simply has to tend to prove the conspiracy in the Rule 401 sense, not in some larger sense or wavier sense. You're getting into weighing of evidence if you go beyond that. And even under Matsushita, after a plausibility finding, weighing of the evidence is as improper as it is in any other context. I think that's all I have to say, unless the court has questions about it. Did you present any evidence of cross-elasticity? Not numerical econometric evidence, Your Honor. What we did prove is that the products were not – CRF is not interchangeable. Cross-elasticity is a proxy. I think if you read, I believe it was Judge Bork's opinion in the Rothery case from the District of Columbia circuit, he makes clear that what cross-elasticity is is a proxy for a finding of non-interchangeability. Non-interchangeability isn't a numerical conclusion. It's a practical conclusion that consumers cannot substitute or will not substitute one product for another. And when you determine what the point is at which they won't substitute, you've established the relevant product market. And practical indicia, industry perception, so on and so forth, all the categories we've mentioned in our brief, are adequate to get to a jury on that issue. You need not show an econometric study showing that, for example, if the price of CRF goes to $100 a bag, people will shift to something else. Nothing else for them to shift to. But just hypothetically, that would be the case, and I think the cases occur. You don't have to adduce that kind of econometric evidence. It just seems to me – the reason I kept asking about it was in every case I've ever – well, not every case I've ever seen, but in many cases I've seen, there's always an expert witness that testifies to that. You know, they do a survey or something. Well, we have an expert witness. There is an expert witness we were prepared to put on in this case, a gentleman actually who participated in the writing of one of the Aretha and Hovenkamp treatises, and he makes perfectly clear in his report that there is no interchangeability between CRF and other fertilizers. Scott's never suggested for a moment that there's another product that's cross-elastic with or interchangeable with CRF. He simply didn't do that kind of econometric study, either because price data was unavailable or for some other reason. All right, Mr. Russell, thank you. We thank both counsel for their arguments, and we'll take the matter under advisement.